53 CCPA

**Application of Robert Cowan SHUMAN and Francis John Meinhardt.**

**Patent Appeal No. 7616.**

United States Court of Customs and Patent Appeals.

June 16, 1966.

George H. Montemayor, Howard M. Herriott, Janesville, Wis., for appellants.

Joseph Schimmel, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for the Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

SMITH, Judge, delivered the opinion of the court:

SMITH, Judge.

The issue here is whether the invention defined by the appealed claims,[1] relating to a writing tip for a ball point pen and a method of making same, is obvious within the meaning of 35 U.S.C. § 103. The appealed claims were considered together by the parties and we shall do likewise.

The references relied on by the examiner are as follows:

Bolvin
(French) 1,009,193 Mar. 5, 1952
Schwartz et al.
(Schwartz) 2,630,383 Mar. 3, 1953

The examiner concluded that the claimed subject matter was obvious based on Bolvin in view of Schwartz.

The disagreement of the parties concerns the teachings of the prior art relating to the composition of the writing tip. We will first examine the teachings of the prior art. Bolvin also discloses a ball point writing instrument. The teachings of Bolvin relied on by the examiner and the board relate to the construction of the writing tip which is spherical in shape and "slightly corrugated." The "corrugations" in the ball resemble grooves in the polished surface of the ball, and result from "rolling the balls in all directions between two plates * * * covered with powdered diamond or other abrasives." The grooves serve to transfer the ink from the ink reservoir to the writing paper as the ball rotates during writing.

The writing tip is a "spherical, surface-hardened *steel ball,* not too highly polished." Also, good results are obtained with "balls made of *gems,* especially of agates."

The specific teaching of Bolvin, concerning alternate ball compositions relied on by the Patent Office, appears at [2] below in Bolvin:

Needless to say, it is possible to make certain modifications of the devices described without departing from the framework of the invention.

Instead of a ball of homogeneous material, it would be possible to use a ball made of [1] some surface-hardened material, or *of* [2] *a compressed agglomerate* made by subjecting to extremely high pressure *certain very fine powders* containing materials capable of constituting on the spherical surface *a very fine mosaic which is extremely hard, but also porous.* It would also be possible to [3] inlay the surface of a ball in an appropriate fashion with very hard powdered materials capable of resisting wear. There is also the possibility of using balls of [4] an alloy of aluminum

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. In application Ser. No. 140,973, filed Sept. 21, 1961, entitled "Ball Point Writing Instruments."

hardened by the electrolytic process. [Emphasis added.] [2]

The Schwartz reference relates to "a tool made from cemented carbide which has been previously sintered and crushed into granules, which * * * is useful for such purposes as drilling dental enamel, glass, masonry, ceramics and metal, and for grinding similar materials." Schwartz discloses several tools including a "dental burr" wherein the finished burr is in the form of a sphere mounted on a shank. The spherical burr is composed of "sharp, irregular [cemented carbide] granules" which have been "screened to a size ranging between about 20 mesh to about 325 mesh." The granules are "then placed in a mold and compacted by vibration or by the application of pressure." Schwartz states:

* * * The compact density that is obtained by either of these methods of compacting is limited to a minimum of approximately 40% voids due to the fact that the hard irregular granules tend to lock together in such a manner as to substantially preclude further compaction. The compacted granules are subsequently resintered by heating * * * [and] during the resintering no pressure is applied to the compact.[3]

Schwartz describes the resulting product as follows:

* * * It will be appreciated that when the sintered carbide is ground to a fine powder that the particles lose the characteristics of a sintered cemented carbide material. This is not true however of the granules which are selected to form the tool which is the subject matter of our invention. The selected granules * * * bond together at their points of contact only

and retain their identity as discrete hard imporous granules of cemented carbide and have substantially the same size that they had prior to resintering. The resulting product is a porous tool comprised of irregularly shaped imporous hard selected carbide granules which are bonded together at their points of contact only and which has a minmum porosity of approximately 25% and a maximum porosity of approximately 60%.[4]

The examiner's reasoning, adopted by the board and cited approvingly by the solicitor, was as follows:

The Bolvin ball * * * in one of its modes of manufacture, may be formed by an agglomerate of very fine powder compressed under very high pressure so as to provide, on the spherical surface of the ball, a very fine mosaic, very hard but porous * *. It would be obvious to apply to the sintering art for the choice of such very hard material and to select the material disclosed in Schwartz et al; namely, a plurality of obviously randomly distributed carbide particles sintered together to form a cemented carbide compact * * *.

The solicitor in his brief adds:

* * * Schwartz et al. show[s] a very rough surface indeed * * *. Obviously, some surface grinding is called for here. One skilled in the art must be presumed to know how the required grinding could be performed, inasmuch as appellants disclose no specific grinding step for their own sintered carbide ball. Thus, it is evident that appellants' invention was essentially obvious.

2. Numerical designations are by the court. Appellants disagree with the above translation of Bolvin which was relied on by the board. We do not find it necessary to consider the alternate translation advanced by appellants.

3. Schwartz also states:
    * * * by selecting varying proportions of large and fine granules, we can

increase or decrease the degree of fluid permeability of the resulting tool between about 25% voids as a minimum and 50 to 60% as a maximum.

4. Schwartz also discloses that the granules consist of fine particles of carbide, one-half to 10 microns in size, surrounded by a binder.

Appellants state in their specification that their writing ball is:

\* \* \* an integral structure composed of tungsten or titanium carbide, the binder metal itself, and intermediates of the carbide and the binder metal. \* \* \*

The surface of the ball consists of "lands" and "pits" as:

\* \* \* it has been determined to be extremely important that the percentage of the cumulative land area of the apparent total surface area of the ball be maintained within predetermined limits in order to provide a ball having acceptable writing characteristics which does not unduly wear away the seat.

\* \* \* \* \* \*

\* \* \* land area percentages exceeding 85 per cent are no more satisfactory than steel or other smooth balls of the prior art. \* \* \*

\* \* \* \* \* \*

\* \* \* if the percentage land area of the ball is maintained within the range of 30 per cent to 85 per cent there will be produced balls which will write over greasy surfaces and which will not unduly wear the ball seat.

In order to minimize seat wear and to provide satisfactory writeability of the ball over slick or greasy surfaces, the specification states:

\* \* \* the entire surface of the ball should preferably be textured to the same degree, that is, the surface texture should be homogenous throughout and to this end the sizes of the individual land areas should be controlled.

\* \* \* it has been found advantageous to sinter the ball from carbide particles having a diameter of 5 microns or less on the average.

\* \* \* \* \* \*

\* \* \* If tungsten carbide particles of sufficiently large size are used, the result is a porous mass of particles of tungsten carbide joined together by cobalt and compositions of tungsten carbide and cobalt. However, if tungsten carbide particles having a aver-

age size of the order of 5 microns or less in diameter are used, then the resulting ball is substantially solid throughout. \* \* \*

Schwartz teaches the construction of spherical burrs having exposed cutting edges consisting of sintered granules bonded together at points of contact only to permit coolant to flow through the burr during the cutting operation which washes away excess abraded material, reduces operating temperatures and allows higher cutting speeds. Appellants utilize similar starting materials but by selection of particle sizes achieve a substantially solid sphere having a substantially homogenous surface texture as ink transfer means which cooperates with the ball housing without causing the excessive wear therein as would be caused by use of a rough textured ball such as Schwartz produces.

Appellants' brief sets forth appealed claim 1 and includes a contrast to the teachings of the prior art.

Referring now particularly to appealed Claim 1, which Appellants submit as being representative, Appellants advance the following as demonstrating patentable distinctions over the references relied on by the Examiner and the Board of Appeals:

1. *In a ball point writing instrument, a writing ball* (the Schwartz reference is clearly inapplicable to such a structure) *comprising a plurality of carbide particles sintered together to form a cemented carbide compact* (the French Bolvin patent fails to disclose or suggest any such structure), *said ball having a substantially true spherical surface except for pits which interrupt land areas on the ball surface, said surface having a substantially homogeneous texture formed by randomly distributed lands and pits, said lands being formed by carbide particles* (Schwartz shows only sharp-pointed carbide particles, and fails to show or suggest spherical land surfaces formed of carbonide particles, while the French Bolvin patent

makes absolutely no showing or suggestion of the use of carbide particles to form the land surfaces) and said pits being the spaces between said lands.

As we view the teachings of the references, Schwartz shows a spherical dental burr composed of cemented carbide granules having 40% voids and exposed cutting edges. Schwartz states:

\* \* \* The fast cutting action of our dental burr is due to the multiplicity of the cutting points present on the irregular shaped cemented carbide granules exposed on the burr's surface \* \* \*. Our burr has a much longer life than a steel burr and is produced at a relatively low cost. The application of the coolant which passes out through the porous burr and over its entire area continuously washes away the excess abraded material and keeps the drill clean. \* \* \*

It thus seems that modifying the Schwartz spherical burr as suggested by the solicitor by grinding or polishing would not yield a spherical "surface having a substantially homogeneous texture formed by randomly distributed lands and pits," as called for in claim 1. Schwartz thus falls far short of teaching a spherical ball, modified by grinding, which, as urged by the solicitor, may serve as a ball in the Bolvin writing instrument.

Considering Bolvin, the specific teachings relied on are set forth only in a conclusionary paragraph alleging that it is possible to make certain "modifications" without departing from "the framework of the invention." In lieu of balls made of steel or gems, discussed in detail, it is alleged that the balls may be made from "some surface-hardened material" or "very fine powders" which would result in a "spherical surface of a very fine mosaic which is extremely hard, but porous." We think that such general allegations, appearing as a departure from the more specific teachings concerning the ball composition and devoid of detail as to the surface texture other than it being "mosaic, \* \* \* but

porous," is not a disclosure or a suggestion of the spherical texture of appellants' ball.

■ We are required to evaluate the claimed subject matter as a whole against the teachings of the prior art references of record. 35 U.S.C. § 103. References are evaluated by ascertaining the *facts fairly disclosed therein as a whole*. It is impermissible to first ascertain factually what appellants *did* and then view the prior art in such a manner as to select from the random facts of that art only those which may be modified and then utilized to reconstruct appellants' invention from such prior art.

Here we do not find the claimed subject matter obvious from the prior art teachings of a ball consisting of fine powders having a hard mosaic porous surface modified by the prior art porous spherical cutting tool whose cutting surfaces comprise cemented carbide granules.

Appellants have submitted substantial evidence to demonstrate the commercial success of their invention and the adoption of their invention by the writing industry. Appellants submit that "the invention was not obvious to the general industry prior to the public disclosure of Appellants' invention," and that substantial segments of the industry have copied appellants' ball construction. The solicitor attacks this evidence, stating it is "unverified, lacks original dating in many instances, and is advertising hearsay."

■■ It is not necessary to ascertain whether each piece of evidence is defective in the manner alleged by the solicitor as the evidence was offered to show commercial success and immediate adoption by others and not as sworn statements of individuals. There is no doubt that such evidence is relevant as bearing on "secondary considerations" in an inquiry under section 103. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

■ We think the solicitor advocates too stringent a standard as to admissibility of evidence to prove the secondary

considerations stated above. Appellants could hardly expect competitors to give sworn statements of "adoption," or "long felt but unsolved need." Nor are advertising statements of competitors entitled to no weight concerning commercial success or adoption because of statements lauding the product or unknown authorship. Rather, they appeared to be a reasonable method by which evidence on such secondary considerations may be brought to the attention of the Patent Office.

Smith, J., dissented in part.

 Appellants have submitted evidence demonstrating secondary considerations concerning the non-obviousness of their invention. While we believe the prior art of record does not render the claimed invention obvious within the meaning of section 103, any doubt as to the correctness of this conclusion appears to have been resolved in appellants' favor by this evidence.

We conclude that the claimed subject matter meets the condition of patentability specified in section 103.

Reversed.

---

L. Gaylord Hulbert, Detroit, Mich., for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

53 CCPA